IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONNA JONES,

      Plaintiff,

v.

FRED HAMIC, et al.,

      Defendants.

Case No. 1:10-cv-202-MEF
(WO—Publish)

## MEMORANDUM OPINION & ORDER

### I. INTRODUCTION

Greg Ward ("Ward") caused a firestorm surrounding Donna Jones ("Jones"), the plaintiff in this case, when he accused her of misusing Geneva County's overtime system in her role as county administrator. Initially, Ward's accusations caused the Geneva County Commission ("the commission") and Geneva County Personnel Board ("the personnel board") to move her from hourly pay to a salary. But Ward's finger pointing eventually led to a criminal investigation of Jones, followed by her indictment and arrest, and it culminated in her firing by Probate Judge Fred Hamic ("Hamic"). After a state agency's audit seemingly exonerated her, the district attorney dropped the criminal charges. Yet her employer refused to reinstate her, and so she filed suit, alleging that the defendants' actions violated the Fair Labor Standards Act (FLSA) and the First and Fourteenth Amendments.

The defendants—the personnel board, the commission, Hamic, and Hazel Odom—have since moved for summary judgment, contending there are no trial-worthy issues on Jones's claims. (Docs. # 99, 101.) Although there is a genuine issue of material fact about whether Jones was treated unfairly, there is no question about whether the defendants violated federal law—they quite clearly did not. Summary judgment, therefore, is due to be GRANTED in their favor. The reasons why are discussed below.

## II. JURISDICTION & VENUE

The Court has jurisdiction over Jones's claims under 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights). The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b). The Court finds adequate allegations supporting both contentions.

## III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present

evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A plaintiff, indeed, must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### III. BACKGROUND

**A.     Rules, regulations, and policies**

The Geneva County Personnel Board was created "to establish a civil service system for Geneva County." 1985 Ala. Acts No. 85-587. To this end, the five-member board[1] is charged with "provid[ing] for the adoption, amendment, repeal of rules, regulations, determinations, job classification plans, pay plans, and mandatory and/or permissive retirement plans." *Id.* When it comes to classifying civil service members, Geneva County must divide them "into the exempt service and classified service." *Id.*

The exempt services include elected officials, voluntary personnel, consultants rendering temporary service, part-time or seasonal employees, attorneys, and employees not paid exclusively by Geneva County. *Id.* Classified service employees include all Geneva County employees paid out of Geneva County funds and "not specifically placed in the exempt service." *Id.* The personnel board may place an employee into the exempt service by resolution—but only after a recommendation by the applicable board.[2] *Id.*

Using the powers granted to it under the Geneva County Civil Service Act, the personnel board created the *Geneva County Personnel Handbook*. Among other employment matters, the *Handbook* addresses overtime pay:

> A. Employees who work in FLSA non-exempt jobs will be paid overtime pay, or given compensatory time off, for those hours worked in excess of the established regular hours for the workweek/period. Except for Deputy Sheriff's personnel, overtime

---

[1] The Geneva County Commission, the sitting probate judge, the sheriff, the circuit clerk, and the revenue commissioner get to appoint one personnel board member apiece.

[2] To remove the county administrator from the classified service, the personnel board would need a recommendation from the Geneva County Commission first. (Odom Dep. 76; Hatcher Dep. 22–23, 106–09.)

> pay or compensatory time off will not be earned until the employee
> exceeds the established regular hours for the workweek/period.
> Deputy Sheriff personnel will have their overtime entitlements
> calculated in accordance with state law.
> . . .
>
> B. Employees who work in jobs specifically exempted from the
> overtime requirements of the FLSA will not be paid overtime pay
> for overtime work but may take comparable time off at the
> convenience of the employee.

(*Personnel Handbook* 47–48.)

The Geneva County Civil Service Act also established a grievance system for

employees. Under the system, an employee can file a grievance with her supervisor

within five working days of the employee learning of a violation or misapplication of a

personnel rule. (*Personnel Handbook* 42.) And if the employee disagrees with how the

supervisor handles the complaint, the employee can appeal the supervisor's decision to

the Geneva County Personnel Board within ten working days. (*Id.* at 42–43.) The

personnel board will then hold a hearing on the grievance, at which time the aggrieved

employee can have counsel present. (*Id.* at 44.) If the employee remains dissatisfied with

the decision, she can appeal to the Circuit Court of Geneva County. (*Id.* at 45.)

## B.    Underlying facts

Donna Jones began working for Geneva County, Alabama, in 1979. (Jones Dep.

15.) She served as county probate clerk and accounting clerk until the Geneva County

Commission hired her as county administrator in 1990. (*Id.* at 17.) In that position, Jones

reported to the probate judge and her duties included hiring, supervising, and firing

employees of the department she headed. (*Id.* at 20.) She also handled a number of other

5

bureaucratic chores: she did the county's pay roll, paid its bills, maintained its finances, prepared the annual budget, and took the Commission's minutes during meetings. (*Id.* at 22–23; Everett Dep. 15–17.)

Fred Hamic ran for and won a spot on the Geneva County Commission in November of 2000. (Jones Dep. 55.) During his first term, Hamic worked with Jones and the two got along just fine. (*Id.* at 55–56.) After his initial term expired, he ran and won again, but this time he didn't complete his term, opting instead to run for probate judge in 2006 against the incumbent, Harry Adkinson. (*Id.*) Judge Adkinson happened to be a close friend of Jones's. (*Id.*)

As the contest between Hamic and Adkinson heated up, Jones encountered a number of people who told her that Hamic would fire her if he won. (Jones Dep. 64–65.) Hamic ended up winning the election, and the day after his victory, Jones called him to say congratulations. (*Id.* at 61.) Hamic responded by saying, "Little lady, things are going to be different at the courthouse," right before hanging up on her. (*Id.* at 61–62.) Despite the ominous warning, Hamic refrained from firing Jones when he took office in January of 2007. (*Id.* at 288.) In fact, Jones asked Hamic if he planned on firing her, and Hamic said he wouldn't so long as she continued doing her work well. (Hamic Dep. 29.)

As probate judge, Hamic chaired the Geneva County Commission. (Hamic Dep. 22.) In Geneva County, the commission chairman doesn't vote—except in case of a tie. (*Id.*) Against this backdrop some confusion arose about who appointed the county administrator; no one knew for sure whether it was the commission or the chairman that did. (*Id.* at 18–19.) To clear things up, commissioner Dennis Finch moved to make the

probate judge the appointing authority.[3] (*Id.* at 19.) The motion passed, and Hamic

assumed that role in February of 2007. (*Id.*; Jones Dep. 72.)

A year later, in February of 2008, Hamic spoke with Jones about her use of leave

time. (Jones Dep. 68.) During their conversation, he told her that he wouldn't approve

additional overtime for her without first getting the requests approved by the commission.

(*Id.*) Later that month, the commission's minutes reflect that Hamic asked it to approve

Jones's overtime requests:

> Chairman Hamic asked the commission for their direction in
> approving overtime for Donna Jones, Chief Administrative Officer,
> who is short two employees in her office. Commissioner Minshew
> recommended that Donna work from 8-5 and then go home.
> Commissioner Finch said that the Probate Judge/Commission
> Chairman is the Appointing Authority and he should approve her
> overtime. Chairman Hamic said that he has eliminated overtime in
> his office. Donna advised the commission that Chairman Hamic
> has approved her overtime for the last two weeks. Chairman
> Hamic asked if the commission would approve 15 hours per week
> overtime. Donna said that she had 22 hours of overtime last week.
> The commission authorized Chairman Hamic to approve 20 hours
> of overtime a week for Donna Jones until she is fully staffed.

(Jones Dep. 69, Ex. 5.) Hamic seemed sympathetic to Jones's predicament because she

had to take on extra work due to the staffing issues. (Jones Dep. 68.) Yet he never

requested temporary help for the office. (Odom Dep. 143.) Perhaps because of this, Jones

decided to retire sometime that February. (Jones Dep. 137.) She submitted her retirement

application to the Employee's Retirement System and even went so far as to begin

---

[3] The *Geneva County Personnel Handbook* defines "Appointing Authority" as "the Geneva
County officer, official, or board designated by resolution of the governing body as being the individual
having authority to fill vacancies in authorized positions in specific county departments or boards."
(*Personnel Handbook* 5.)

cleaning out her office and removing the pictures from her walls. (*Id.* at 138, 151–52.) She did not, however, go through with her plan.

The Geneva County Commission held a meeting on March 10, 2008. (Audio Mins. Mar. 10, 2008.) Sheriff Greg Ward decided to attend that day so he could ask the commission if it had authorized Jones's use of overtime. (Jones Dep. 85–86.) Ward had taken an interest in the issue because he believed that Jones's use of overtime affected his salary and kept the deputy sheriffs from receiving overtime and higher pay. (Ward Dep. 15–17.) When it was his turn to speak, Ward told the commission that he had started an investigation into Jones's overtime usage and that he planned on turning the results over to the State of Alabama. (*Id.* at 87.) Jones, who was also there, asked Ward why he would do that; he responded by saying that, if he answered her question, he would have to read her her rights. (*Id.* at 88; Audio Mins. Mar. 10, 2008, at 38:05.) Ward even went a step further, threatening with an indictment members of the commission that defended Jones. (*Id.* at 40:50–41:50.)

After Ward's dramatic appearance, the commission discussed the county administrator position and whether it should be salaried. (Audio Mins. Mar. 10, 2008, at 43:48–44:37.) Throughout the debate, Jones maintained that she would have no problem moving from hourly pay to a salary. (*Id.* at 45:44.) Following the discussion, the commission voted unanimously to end overtime for Jones's position and make her a salaried employee. (Jones Dep. 92; Audio Mins. Mar. 10, 2008, at 55:00–57:00.) It decided to do the same for three other employees, too. (Audo Mins. March 10, 2008, at

55:00–57:00.) But the commission did not explicitly state that the vote would reclassify

her and the other employees as exempt under the Geneva County Civil Service Act.[4]

Right after the meeting, Hazel Odom called Jeff Hatcher, the chair of the Geneva

County Personnel Board. (Odom Dep. 32–33; Hatcher Dep. 51–52.) Odom told Hatcher

that the commission had voted to change the county administrator position "from

classified to exempt, and that they requested the personnel board to act on that." (Odom

Dep. 33–34, 95–96.) Even though the commission did not explicitly state that it had

changed Jones's position from classified to exempt, Odom explained that she inferred

that it did because "the classified positions were the hourlies and the exempt positions

were the salaried." (*Id.* at 38–39.)

Two days after the upheaval caused by Sheriff Ward, the personnel board held a

special session. (Hamic Dep. 25.) The board did so to consider the commission's request

that the four employees—Jones and three others—be moved from the classified to the

exempt service, thereby making them salaried employees. (Pers. Bd. Mins. Mar. 12,

2008.) Jones attended the meeting after Odom came to her office and told her to come.

---

[4] The defendants claim the commission floated the idea of moving Jones from the classified
service (paid hourly) to the exempt service classification (paid on a salaried basis) during the March 10,
2008, meeting. They support this contention with the written meeting minutes, which Jones herself took.
(Jones Dep. 92.) Jones, however, denied the accuracy of her minutes—albeit cryptically—during her
deposition. (*Id.*) In addition, the Court has listened to the audio tape of the meeting, and, while there was
some discussion about classified and exempt employees (Audio Mins. Mar. 10, 2008, at 1:02:00), it is
unclear whether the motion contained a provision meant to reclassify Jones as exempt. Due to this
discrepancy, and because this is a motion for summary judgment, the Court has credited Jones's version
of the facts.

(Jones Dep. 98–100.) This was the first she had heard about the session; she did not get prior notice from the board. (Odom Dep. 25–29, 31–32; Hatcher Dep. 52–53.)

At the meeting, Hatcher told Jones that the commission had asked the personnel board to change her position from classified to exempt. (Hatcher Dep. 55–56.) He further informed her that she would no longer have the protections of the *Personnel Handbook* if the board reclassified her. (*Id.*) Jones did not object to the reclassification.[5] (*Id.* at 70; Jones Dep. 126.) In the end, the personnel board decided to move the chief clerk, the chief administrative officer, the solid waste director, and the EMA director to the exempt service from the classified service. (Mar. 12, 2008 Hr'g Tr. 39.) This effectively changed the way the affected employees were paid, and it removed their protections under the *Personnel Handbook*. (*Id.*) Upon becoming a classified employee, Jones's salary equaled her former hourly rate times 40 hours. (Pers. Bd. Mins. Mar. 12, 2008.)

Two days later, on March 14, 2008, Jones submitted a written grievance to Hamic in which she complained about the change in her employment status. (Jones Dep. 52–54; 113–14; 115–16.) Jones tried to go over the grievance with Hamic, but he told her he couldn't talk to her right then and that he would pass it along to someone who would handle it. (*Id.* at 116–17.) Hamic later responded to Jones's complaint in writing, stating that it did not "constitute a grievance within the meaning of the Act 85-587," because "th[e] action was not taken by the appointing authority but by the Geneva County Commission and the Geneva County Personnel Board." (Hamic Resp. 1.) Around the

---

[5] She claimed later that the gravity of the change "didn't sink in until I had already left the meeting." (Jones Dep. 126.)

same time, Hamic contacted Harold Sconyers, the owner of Sconyers Insurance Agency, to see if Geneva County's surety bond would cover Jones if she was indicted for a felony. (Sconyers Dec. at ¶ 3.) The instrument stated that the "Bond shall be deemed cancelled as to any Employee . . . immediately upon discovery by [Geneva County or an insured] of any act on the part of such Employee which would" trigger liability under the insuring agreement. (Doc. # 111-16.)

The Geneva County Commission next met on March 24, 2008. (Jones Dep. 123.) During the meeting, Jones asked various commissioners about the changes the personnel board had made to her position. (*Id.* at 124–25.) The commissioners directed most of these questions to Hatcher. (Hatcher Dep. 19–21, 66–69.) The minutes reflect that the commissioners "stated that they '*requested*' the Personnel Board to take the actions of making the named employees exempt rather than '*recommended*'" that they do so. (Cnty. Comm'n Mins. Mar. 24, 2008.) This suggests the personnel board had jumped the gun by reclassifying Jones, because the civil service act requires the personnel board to have the commission's authorization before it can reclassify an employee.

Three days later, Jones was indicted. (Jones Dep. 130.) The indictment charged her with using her position for personal gain by paying herself for overtime during periods in which she used sick leave and vacation time. (*Id.* at Ex. 2.) Jones turned herself in the next day, and she was released after posting bond. (*Id.* at 132–33.) When she returned to the office, Hamic fired her after a brief encounter. (*Id.* at 288; Hamic Dep. 69.) According

to Hamic, he fired Jones because she had to be bonded to work as county administrator and the indictment caused her to lose coverage.[6] (Hamic Dep. 103–05.)

Jones, on April 3, 3008, filed a second grievance with Hamic and an amended grievance later that day, both of which related to her firing. (Jones Dep. 154; Docs. # 103-16, -17.) Taken together, the grievances claim that Hamic failed to comply with the *Geneva County Personnel Manual* and denied her due process. (Docs. # 103-16, 17.) After Hamic failed to respond, she appealed directly to the personnel board on April 22, 2008. (Doc. # 103-18.)

Jones also applied for unemployment compensation in April of 2008. (Jones Dep. 170.) The Alabama Department of Industrial Relations (ADIR), the state agency charged with hearing unemployment compensation requests, held a hearing on the matter. Hamic testified during it, stating that Jones was fired because she had submitted "irregular time sheets," which was a dishonest act and an ethics violation. (Jones Dep. 179–80.) The ADIR concluded that Jones had "been including vacation pay or sick leave in computing

---

[6] Jones often tries to disguise arguments as objective facts in her recitation of the evidence produced during discovery. This is most apparent when discussing the bond issues, as she seems to argue that Hamic and Geneva County should have fired her *earlier* than the day her indictment came down. She essentially claims that, because they knew of the allegations underlying the indictment, they should have fired her as soon as they heard the news. For support, she cites a portion of a letter from the surety company that says, "The bond does not require a criminal indictment and/or conviction as a condition precedent to recovery under the bond." (Doc. # 111-15.) And from there she contends that the county and Hamic had an "obligation to report . . . as soon as [they] received information that suggested that Jones had committed a dishonest act." (Doc. # 112 at 21.) This argument—which Jones improperly includes in the non-argumentative portion of her brief—fails because it assumes that, because an indictment isn't *necessary* to revoke the bond, it can't be *sufficient* either.

overtime hours for which she was paid time and a half" but to which she was not entitled. (Doc. # 103-29.) The agency consequently denied her claim.

In reaching this decision, the ADIR did not, however, have all of the available evidence before it. An internal audit by the Alabama Department of Examiners of Public Accounts, which went over Jones's time sheets in detail, had not been disclosed to Jones at the time of the hearing, even though it had been completed by then. The audit, prepared by Examiner Jenelle Smith, found only two minor issues with the payroll procedures used by Geneva County, and adduced no evidence of any improper or illegal conduct by Jones. (Smith Dep. 54–66, Exs. 4, 7.)

Jones did not get a copy of the audit until February 24, 2009—well after the ADIR hearing. In fact, she received a copy only after she filed a motion to compel its production in her criminal case. (Smith Dep. 32–36.) And about four months after it was produced, Geneva County's district attorney moved to dismiss the criminal charges against Jones, presumably for lack of evidence. Even so, the defendants did not revisit their decision to fire Jones. (Hamic Dep. 105–06, 108–09.)

After numerous delays, the personnel board, on October 27, 2009, held a hearing on Jones's amended grievance. (Oct. 27, 2009, Hr'g Tr.) At the hearing, Jones had a lawyer and the opportunity to call witnesses, testify, and introduce evidence. (*Id.*) The hearing lasted from 9:30 in the morning until 5:00 that afternoon. (*Id.*) But it did not finish that day, because as the hour drew late, the board decided to wrap things up and make a final decision some other time.

Before the board returned with its decision, Jones filed the lawsuit now before the Court in March of 2010. (Doc. # 1.) A month later, after multiple continuance requests from Jones's attorney, the board reconvened and handed down its ruling: it decided to uphold the change in Jones's status from classified to exempt. (Pers. Bd. Mins. Apr. 20, 2010.)  She appealed the decision to the Circuit Court of Geneva County a month later, but the circuit court has yet to rule on it. She appealed the ADIR's decision, too, but she dismissed that appeal with prejudice sometime in 2009. (Doc. # 103-31.)

Jones's federal lawsuit contains four counts arising out of these facts. The first count alleges that the commission and personnel board violated the Fair Labor Standards Act (FLSA) by firing her in retaliation for her complaint to Hamic about the change in her employment status. (Doc. # 71 at ¶¶ 48–52.) The second count alleges that the commission, personnel board, Hamic, and Odom deprived her of a property interest without due process in the way they reclassified and fired her. (*Id.* at ¶¶ 53–60.) The third count claims that Hamic violated her First Amendment association rights when he fired her because of her past association with Judge Adkinson. (*Id.* ¶¶ 61–65.) She claims too that the commission and personnel board are liable for Hamic's alleged First Amendment violations. (*Id.* at ¶¶ 63–65.) In her fourth and final count, Jones goes back to the Fourteenth Amendment well, alleging that the commission, personnel board, and Hamic deprived her of a liberty interest by denying her a post-deprivation hearing to clear her name after her firing. (*Id.* at ¶¶ 66–73.)

### IV. DISCUSSION

Jones has brought quite a few claims against quite a few defendants. To keep things orderly, the Court will address the defendants' motions for summary judgment as follows. First will be the defendants' contention that the ADIR's decision denying Jones unemployment benefits bars her from relitigating the reason for her firing. The Court will then move on to her retaliation claims under the Fair Labor Standards Act, organizing the discussion by the arguments made by each defendant. Finally, the Court will analyze her Fourteenth and First Amendment claims, in that order, dividing the discussion by defendant.

**A.      Collateral estoppel**

The doctrine of collateral estoppel (also known as issue preclusion) bars a plaintiff from relitigating an issue already raised, litigated, and decided in an earlier proceeding. While this sounds simple enough, applying the doctrine to a given set of facts usually proves tricky: doing so requires reviewing closely the earlier proceeding and it often implicates due process and federalism concerns. Further complicating matters, the rise of the administrative state has required courts to grapple with the question of whether to credit the decisions of state and federal bureaucracies. Should courts defer to these agencies when they make factual findings in a quasi-judicial capacity? Or is judicial review of the bureaucratic process necessary for state agency fact finding to have preclusive effect on issues later raised in federal court?

Here, the defendants argue that the collateral estoppel doctrine bars Jones from relitigating the reason for her firing. They claim that, because the ADIR found Jones had

"submitted irregular time sheets for which she was paid overtime that she was not entitled," and since it decided that she was fired for a "dishonest act connected with her work," she cannot claim that her employer fired her for some other reason. The question for the Court, then, is whether the law requires finding that the ADIR's decision bars some, all, or none of her claims.

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to give a state court judgment preclusive effect if the state's courts would do the same. This includes state court judgments "upholding an administrative body's findings" so long as "(1) the courts of that state would be bound by the decision; and (2) the state proceedings comported with the requirements of due process." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982)); *see also Ross v. Renaissance Montgomery Hotel & Spa*, No. 2:11-cv-301, 2012 WL 1032618 (M.D. Ala. Mar. 27, 2012) (Fuller, J.) (giving issue preclusive effect to agency finding reviewed by state trial court). While the Full Faith and Credit Act applies to state court judgments, it does not apply to unreviewed administrative decisions. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 794 (1986). But does this mean that an unreviewed state agency decision can never have preclusive effect?

The answer decidedly is no. Although the *Elliott* Court held that unreviewed agency findings have no preclusive effect on Title VII claims, it also held that those same findings could in fact have a preclusive effect on claims brought under the Reconstruction

civil rights statutes.[7] *See* 478 U.S. at 796–97. In reaching this result, the Court relied on how it often "fashioned federal common-law rules of preclusion in the absence of a governing statute." *Id.* at 794. From there it went on to ask whether to create such a rule for Title VII and § 1983 claims. *Id.* at 794.

The *Elliott* Court rejected a preclusion rule for Title VII claims because the statute requires the EEOC to give weight to state agency decisions, but does not require the agency to accept those decisions wholesale. Thus, the Court reasoned, "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court." *Id.* at 795. Conversely, the Court noted that § 1983 lacked language expressing "any congressional intent to contravene the common-law rules of preclusion." *Id.* at 797 (quoting *Allen v. McCurry*, 449 U.S. 90, 97–98 (1980)). Therefore, because the policies undergirding the collateral estoppel doctrine—repose, efficiency, federalism, and comity—generally weigh in favor of preclusion as a first principle, the Court gave preclusive effect to the state agency's unreviewed fact finding on the plaintiff's § 1983 claim. *Id.* at 798–99.

At bottom, *Elliott* teaches that, unless a federal statute has language showing that Congress intended to override established preclusion law, federal courts should give a state agency's findings preclusive effect if state courts would do the same. *See id.* at 799 (citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). Put another way, *Elliott* effectively sets up a presumption in favor of applying the state's

---

[7] The statutes included 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988. *Elliott*, 478 U.S. at 790 n.1.

preclusion rules to unreviewed decisions made by state bureaucracies. The rule only applies, however, if the agency acted in a judicial capacity; that is, if it resolved disputed issues of fact after giving the parties a full and fair opportunity to litigate. *Kremer v. Chem. Constr. Co.*, 456 U.S. 461, 480 (1982) (citing *Allen*, 449 U.S. at 95; *Montana v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 328–29 (1971)). As a necessary corollary, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana*, 440 U.S. at 164 n.11.

Taken together, the relevant Supreme Court decisions set up a three-step inquiry for determining whether a state administrative agency's unreviewed fact finding deserves preclusive effect. First, a court has to see if the statute under which the plaintiff asserts a claim overrides the federal common law's preference for barring relitigation of questions already litigated and decided. If the applicable statute shows that Congress intended to push aside federal preclusion law, the inquiry stops there and the unreviewed agency determination will have no effect. *See Elliott*, 478 U.S. at 796–97 (finding no preclusion of Title VII claims); *Astoria Fed. Sav. & Loan v. Solimino*, 501 U.S. 104 (1991) (holding unreviewed state agency decisions have no preclusive effect on Age Discrimination in Employment Act (ADEA) claims); *JSK v. Hendry Cnty. Sch. Bd.*, 941 F.2d 1563 (11th Cir. 1991) (finding unreviewed state agency decision did not preclude claim brought under Education for All Handicapped Children Act (EAHCA)). But if the applicable statute fails to show that Congress intended to displace the federal common law of preclusion, the court must move on to the second step—determining if the state's own

courts would give the agency's fact finding preclusive effect. If they would, the third and final step requires the federal court to scrutinize the procedures used by the state agency to reach the result that it reached, measuring their "quality, extensiveness, [and] fairness," *Montana*, 440 U.S. at 164 n.11. Only then can a federal court give preclusive effect to a state agency's unreviewed fact finding.

Jones brings her claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215, and one of the Reconstruction civil rights statutes, 42 U.S.C. § 1983. *Elliott* made clear that unreviewed state agency findings can preclude § 1983 actions if the final two steps of the inquiry are satisfied. As for her FLSA claim, there is no Supreme Court or circuit court of appeals cases dealing with the issue. However, two district courts have addressed the question, albeit in unpublished decisions. In *Akwesi v. Uptown Lube & C/W, Inc.*, the Southern District of New York held that unreviewed state agency findings could not preclude FLSA claims because "the broad remedial purpose underlying the FLSA seems antithetical to common law doctrines of preclusion." No. 07-cv-335, 2007 WL 326732, at *3 n.12 (S.D.N.Y. Dec. 3, 2007). In *Thakkar v. Balasuriya*, the Southern District of Texas reached the opposite result, holding that the plaintiff did not meet his burden of showing that FLSA's administrative scheme exempted FLSA claims from common law principles of preclusion. No. 09-cv-841, 2009 WL 2996727, at *5 (S.D. Tex. Sept. 9, 2009).

The Court finds the *Thakkar* decision more in harmony with established precedent. In *Elliott*, the Supreme Court implied strongly that there exists a presumption in favor of preclusion, and that the party challenging the preclusive effect of an unreviewed state

agency decision bears the heavy burden of showing that Congress intended to rebut the presumption. Indeed, Congress knows about federal preclusion law when it legislates, and absent a strong showing that it intended to override firmly entrenched preclusion law by enacting FLSA, this Court will give the ADIR's findings collateral estoppel effect to the extent that an Alabama court would. Doing so furthers the principles of federalism, comity, efficiency, and repose underlying the collateral estoppel doctrine. *See Elliott*, 478 U.S. at 797–98; *Allen*, 449 U.S. at 94; *cf. Barnes v. City of Dothan*, ___ F. Supp. 2d ___, ___, 2012 WL 274746, at *5 (Jan. 31, 2012) ("principles of federalism and comity require the federal courts to refrain from taking over the States' police powers and undermining their judicial processes. Allowing plaintiffs to attack state court convictions with federal civil suits implies a distrust of state courts—it impugns their character, competency, and commitment to the rule of law—without warrant to do so."). Here, Jones has failed to offer up an argument about whether Congress intended FLSA to override federal preclusion law. As a result, the Court holds that she has failed to meet her burden on this point, and that unreviewed state agency findings can be given collateral estoppel effect in a FLSA suit.

Even so, and even assuming Alabama Courts would do the same, the Court is wary about using the ADIR's findings to preclude Jones from contesting the reason for her firing. This is because it is not at all clear that Jones had a full and fair opportunity to litigate the issue before the ADIR. At the ADIR hearing, Hamic testified that Jones had submitted "irregular time sheets." And this testimony likely served as the basis for the ADIR's finding that she was discharged for submitting false time sheets to get

undeserved overtime pay. Yet a review of her time sheets by a neutral auditor, which the defendants failed to disclose to her and which she garnered only through the criminal discovery process, seemingly cleared her of any wrongdoing. The defendants dispute the significance of the report, of course, contending that it only aggregated information already available to Jones. But the fact remains that they had it in their possession at the time of the hearing. So why keep it from Jones if it wouldn't have helped her? The reason, perhaps, is because it would have been helpful in cross-examining Hamic and undermining his testimony. For instance, Jones could have questioned him about how he and the auditor came to different conclusions about her time sheets and she could have asked him to explain the reason why. Because the defendants deprived Jones of this opportunity by concealing the auditor's report, the Court sees no reason to reward their behavior by estopping Jones from relitigating the issue with the freshly disclosed evidence.[8] Accordingly, the defendants' argument that summary judgment is due to be granted on collateral estoppel grounds fails.

---

[8] The defendants try to overcome their concealment of the audit by noting that Jones voluntarily dismissed her appeal in state circuit court. From there they argue that if she really thought the audit exculpated her, she could have followed through with her appeal, and that her failure to do so further supports precluding her claims. But this argument ignores how reviewing courts often defer to the findings of lower adjudicative bodies. Due to the possibility of bias in favor of the ADIR's decision, it was not unreasonable for Jones to want to dismiss her appeal and seek a different remedy in federal court. While taking this route may not be proper in other situations—for example, where a plaintiff seeks to relitigate an issue already fairly decided—here it was the *defendants'* failure to disclose the auditor's report that prejudiced Jones in the first place and which arguably prejudiced her appeal.

**B.      Fair Labor Standards Act (FLSA) claims**

Jones's first claim centers on the FLSA's antiretaliation provision, 29 U.S.C. § 215(a)(3). She contends that the letter she gave to Hamic on March 14, 2008, amounted to a FLSA complaint and that she was fired because she filed it. The defendants respond by arguing that Jones was fired because of her misconduct, and, besides, the grievance would not have put a reasonable employer on notice that she had complained of a FLSA violation. The personnel board adds that it was not Jones's employer at the time, and therefore it cannot face liability. The Court will first determine who meets the statutory definition of "employer" and then address the sufficiency of Jones's grievance.

**1.      Jones's employer for FLSA purposes**

Only an employer can face liability under FLSA. 29 U.S.C. § 207; *Welch v. Laney*, 57 F.3d 1004 (11th Cir. 1995). FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). As this definition suggests ("*any* person"), an employee can have more than one employer. *Antenor v. D&S Farms*, 88 F.3d 925, 929–30 (11th Cir. 1996) (citing 29 C.F.R. § 791.2). The question of whether a particular defendant is an employer is a legal one for the Court to decide. *Id.* at 929; *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986).

When a plaintiff proceeds on a joint employment theory, a federal court has to examine her individual relationship with each alleged employer. *Antenor*, 88 F.3d at 932. A court does so by looking at the economic realities of the situation, *id.*, and "all the facts in the particular case." 29 C.F.R. § 791.2. Relevant questions a court should ask include:

Did the employment take place on the alleged employer's premises?

How much control did the ostensible employer have over the putative employee?

Did the alleged employer have the power to fire, hire, or modify the employment conditions of the person claiming to be its employee?

*Welch*, 57 F.3d at 1011 (citing *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669–70 (5th Cir. 1968)).

The personnel board contends that Jones's employment took place on the commission's premises and that it had no authority to direct or control her work. (Doc. # 100 at 6.) And the board notes that it could not fire her even if it wanted to. (*Id.*) Hence, the board claims, it is not an "employer" under FLSA. Jones disagrees, however, arguing that the personnel board meets the statutory definition because it "exercised complete control over the decision to reclassify [her] position." (Doc. # 112 at 40.)

The personnel board has the better of this argument. Jones presented no evidence that she worked on the board's premises or that she received her paycheck from the board. Nor has she shown that the board had any control over her day-to-day activities. The only authority the board appears to have had over her was the ability to reclassify her. But it could only get this authority to modify this aspect of her employment status from the commission. The absence of any day-to-day control by the board over Jones, combined with its lack of independent authority over her employment conditions, leads the Court to conclude that the board does not meet FLSA's statutory definition of an

"employer" as a matter of law. Consequently, summary judgment is due to be granted in favor of the Geneva County Personnel Board on Jones's FLSA claim.

### 2. The sufficiency of Jones's grievance

Generally speaking, the Fair Labor Standards Act (FLSA) lists employment rules concerning minimum wages, maximum hours, and overtime pay. As a prophylactic measure, it includes an antiretaliation provision that forbids employers

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the Act], or has testified or is about to testify in such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). Like with other federal employment statutes, courts apply a burden shifting framework to analyze FLSA claims. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000). The plaintiff bears the initial burden of stating a case. She must show "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection between the employee's activity and the adverse action." *Id.* (quoting *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir. 1997). If she succeeds, the employer may offer a legitimate, non-discriminatory reason for the challenged action. *Id.* at 1343. The employee will then have to rebut the employer's reason with evidence of pretext to avoid summary judgment. *Id.*

The first question, then, is whether Jones's March 14, 2008, letter to Hamic amounts to protected activity under FLSA's antiretaliation provision. To qualify as a

protected activity, an employee need not meet any particular level of formality. Even an oral complaint will do. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011). The inquiry, instead of focusing on the formality of the complaint, looks to whether it was "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."[9] *Id.* Put another way, "a complaint is 'filed' when a reasonable, objective person would have understood the employee to have put the employer on notice that [the] employee is asserting statutory rights under the [Act]." *Id.* (internal quotations omitted).

Jones's letter to Hamic states that she was "filing a grievance on the issues indicated below." (Jones Letter Mar. 14, 2008.) And her list of complaints reads as follows:

> 1. I have been demoted to an exempt employee.
>
> 2. The person that informed me on March 12, 2008 in a Personnel Board Meeting what my exempt status means has a direct conflict in this matter as he has a private and professional relationship with me.

---

[9] In *Kasten*, the Supreme Court left open the question of whether an internal complaint—as opposed to a court filing or a complaint filed with the relevant federal bureaucracy—counts under FLSA's antiretaliation provision. For the sake of this summary judgment motion, the Court assumes that the antiretaliation provision applies to internal complaints for two reasons. First, the defendants have failed to raise the issue and have therefore waived it. Second, and more importantly, existing Eleventh Circuit precedent favors doing so. *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989); *see also Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 625 (5th Cir. 2008); *Moore v. Freeman*, 355 F.3d 558 (6th Cir. 2004); *Lambert v. Ackerley*, 180 F.3d 997, 1004 (9th Cir. 1999); *Valerio v. Putnam Assoc., Inc.*, 173 F.3d 35, 41 (1st Cir. 1999); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984); *but see Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 363–365 (4th Cir. 2000).

3. The Commission did not go into executive session and my name and character became an issue of public scrutiny and I was castigated by the Sheriff who threatened me with an arrest during the commission meeting.

4. You signed my time sheets approving all hours that I was to be paid for with no questions asked, which make you a participating party to this situation. Sick leave not included in OT.

5. The Geneva County Commission cannot support any decision to change my status, to publically humiliate me and to make a spectacle of me on the news by any factual means.

6. If there was any problem or anything illegal about what I had done, it should have been handled internally as addressed in the Code of Alabama, Act 85-587.
. . .

7. I am being unjustly accused [and] punished for something the commission has had knowledge of for years.

8. I was working under the guidelines of my job description [illegible].

(*Id.*)

Jones contends that "the Court should . . . assume that the Defendants understood that any complaint by Jones about the change from classified to exempt service was a complaint under the FLSA." (Doc. # 112 at 39.) But she does not explain why this is so. Nor has she cited case law that requires the Court to indulge this assumption.

On the other hand, there is ample reason to find that the letter is not "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten*, 131 S. Ct. at 1335. As to the content, the letter never specifically invokes

FLSA,[10] and all of the itemized complaints deal with how she thinks Hamic, the

commission, and the personnel board applied Geneva County's Civil Service Act to her

unfairly. Item 6 even cites Alabama Act 85-587, the relevant state law. What's more,

neither of Jones's two amended grievances, both of which were prepared with the help of

a lawyer, mentioned FLSA or complained about not receiving overtime pay to which she

was entitled. The amended grievances instead focus on how the defendants applied state

law to her, and the only conceivable mention of federal law dealt with constitutional due

process.

    As for the context of her complaint, Jones filed the grievance four days after the

commission recommended moving her to a salaried position under the Geneva County

Civil Service Act and just two days after the personnel board finalized the decision.

Furthermore, Hamic's response—which he drafted well before Jones's firing and her

lawsuit—refers to Alabama Act 85-587 but not to FLSA. If he had any inkling that she

was complaining about a FLSA violation, wouldn't he have mentioned it in his response?

And his failure to mention FLSA would have at least put Jones on notice that he did not

read her grievance as containing a FLSA complaint.

    In light of its content and the circumstances surrounding the complaint, no

reasonable employer would read Jones's grievance and think, "although she has never

mentioned FLSA before, doesn't mention it now, and even though we've been having a

---

[10] A plaintiff need not mention FLSA specifically to file a complaint under the statute. *See Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1278 (M.D. Ala. 2011) (Fuller, J.). Such a requirement would elevate form over substance. Yet the failure to mention the statute, especially after retaining counsel, is relevant to determining the reasonableness of the complaint in lights of its contents and the circumstances surrounding it.

disagreement about something unrelated to FLSA entirely, it seems like she's complaining about how my actions violated FLSA. Maybe I should investigate further." To the contrary, her claim looks like an attempt to put a favorable gloss on the situation after-the-fact so as to support an otherwise untenable claim. This is exactly what the *Kasten* Court sought to guard against by requiring complaining plaintiffs to file a grievance "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." 131 S. Ct. at 1335.

Besides, even assuming Jones's complaint would have put a reasonable employer on notice, her claim fails on other grounds. When a plaintiff does in fact complain of a FLSA violation, she must have a good faith, objectively reasonable belief that the complained of practice violated the statute. *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984); *cf. Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (applying "good faith, reasonable belief" requirement in Title VII retaliation case). "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."[11] *Clover*, 176 F.3d at 1351.

---

[11] This requirement guards against the unintended incentives anti-retaliation provisions create. That is, by prohibiting employers from firing employees for filing FLSA complaints, the law encourages inadequate employees to file frivolous grievances to immunize themselves from being fired for poor job performance. In this scenario, the employee can use the FLSA complaint not as a shield to protect himself from an overbearing employer, but instead as a sword to raise the cost of firing him. Not only does this hinder the employer by making it harder to fire inadequate employees, it also hurts unemployed workers or workers seeking a lateral transfer by raising the marginal cost of hiring a new employee who, being an

FLSA does not apply to employees who, like Jones, serve in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The Department of Labor has defined a bona fide administrative employee as someone who receives at least $455 per week in salary, performs primarily "office or non-manual work directly related to the management or general business operations of the employer," and who exercises "discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.200. In addition, a plaintiff cannot recover under FLSA unless the employer denied the employee overtime to which she was legally entitled. 29 U.S.C. § 216(b); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946). Jones does not dispute the defendants' contentions that she met the salary threshold; that she had office duties related to the management of Geneva County, like preparing the annual budget and ensuring that payroll was done accurately; and that she exercised independent judgment over significant matters. Nor does she explain how she could have had a good faith belief that her employer denied to her overtime pay when she had actually taken home over $1,000 in unearned overtime. Therefore, since the administrative exemption plainly applies to Jones (and she offers no reason why she would have thought otherwise when she complained to Hamic), and because she could not have objectively believed that the commission owed her overtime wages when she complained to Hamic, the Court finds that, even if her complaint suffices, she could not

---

unknown quantity, may end up proving more adept at manipulating the grievance system than performing the job assigned to him. The "good faith, reasonable belief" requirement ameliorates these problems, at least somewhat, by cutting off the ability of employees to use the retaliation provisions contained in federal employment statutes as a means to make it harder for the employer to fire him or her for some reason unrelated to the underlying purpose of the statute.

have had a good faith, reasonable belief that the commission's decision to reclassify her violated FLSA. Summary judgment is therefore due to be granted in the defendants' favor on her retaliation claim.

## C.     Constitutional claims

Section 1983 provides a remedy when a person acting under color of state law deprives a plaintiff of a right, privilege, or immunity secured by the Constitution, laws, or treaties of the United States. *See, e.g.*, 42 U.S.C. § 1983; *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotes omitted). Put differently, § 1983 serves a vehicle for aggrieved parties to get into federal court and state a claim against certain state actors. Utilizing that vehicle, Jones has brought two constitutional claims by way of § 1983.

In the first, she claims the defendants violated the Fourteenth Amendment by depriving her of both a property and liberty interest without affording her due process of law. (Second Am. Compl. ¶¶ 53–60, 66–73.) Second, she alleges that Hamic, the commission, and the personnel board[12] deprived her of her First Amendment right of association by firing her after Hamic won the election for probate judge. (*Id.* at ¶¶ 61–65.) The Court will address Jones's Fourteenth Amendment claims and then her First Amendment claims, organizing the discussion by defendant.

---

[12] Jones omits Odom from her First Amendment claim.

### 1.     Fourteenth Amendment claims

Jones makes two claims under the Fourteenth Amendment. First, she alleges that she had a constitutionally protected property interest in her employment with Geneva County, and that the commission, the personnel board, Fred Hamic, and Hazel Odom deprived her of procedural due process by reclassifying and firing her in the way that they did. (Doc. # 71 at ¶¶ 53–60.) Second, she brings a so-called "stigma-plus" claim, alleging that the defendants (minus Odom) deprived her of a liberty interest without due process when they fired her absent a hearing before an impartial tribunal and by not giving her an opportunity to clear her name. (*Id.* at ¶¶ 66–73.) The defendants have responded with a smattering of reasons why these claims should be dismissed. The Court will address Hazel Odom's contentions first and then move onto the arguments made by the commission, the personnel board, and Hamic.

### a.     Claims against Hazel Odom

Jones alleges that Hazel Odom, in her official capacity as Geneva County's personnel director, violated her Fourteenth Amendment rights. In moving for summary judgment on this claim, Odom argues that a plaintiff cannot state an official capacity claim against an individual. (Doc. # 100 at 15–16.) Jones failed to address this argument in her response to Odom's motion.

This Court has time and again dismissed as redundant official capacity claims against individuals because they duplicate the claims brought against the municipality itself. *See, e.g.*, *Galloway v. City of Abbeville*, ___ F. Supp. 2d. ___, No. 1:11-cv-663, 2012 WL 2527066 (M.D. Ala. July 2, 2012) (citing *Busby v. City of Orlando*, 931 F.2d

764, 776 (11th Cir. 1991) (internal punctuation omitted)); *Barnes v. City of Dothan*, 795

F. Supp. 2d 1276, 1283 (M.D. Ala. 2011). In any event, because Jones never addressed

Odom's arguments in her summary judgment response, she has effectively abandoned her

constitutional claims against Odom. *See, e.g.*, *Crayton v. Valued Servs. Of Ala., L.L.C.*,

737 F. Supp. 2d 1320, 1330–31 (M.D. Ala. 2010) (citing *Wilkerson v. Grinnell Corp.*, 270

F.3d 1314, 1322 (11th Cir. 2001)). Summary judgment is therefore due to be granted in

Odom's favor.

### b.    Claims against the commission, personnel board, and Hamic

The Due Process Clause of the Fourteenth Amendment prohibits "any State" from

depriving "any person of life, liberty, or property, without due process of law." U.S.

Const. amend. XIV, § 1. Despite this language ("due *process*") the Supreme Court has

held that this clause provides both substantive and procedural protections. *See, e.g.*,

*Zinerman v. Burch*, 494 U.S. 113, 125 (1990). A violation of either can give rise to a §

1983 claim.

"The substantive component of the Due Process Clause protects those rights that

are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'"

*McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut*,

302 U.S. 319, 325 (1937)). Without delving into the details of substantive due process,

the government cannot impinge certain rights—like most of those contained in the Bill of

Rights and some others that the Supreme Court has deemed "fundamental"—"regardless

of the fairness of the procedures used to" do so. *Daniels v. Williams*, 474 U.S. 327, 331

(1986). Because of the open-ended nature of this inquiry, the Supreme Court "has always

been reluctant to expand the concept of substantive due process." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Thus, most matters, like tort and public employment law, "remain[] largely outside the scope of substantive due process jurisprudence." *McKinney*, 20 F.3d at 1556 (citing *Daniels*, 474 U.S. at 332; *Bishop v. Wood*, 426 U.S. 341, 350 (1976); *Bd. of Regents v. Roth*, 408 U.S. 564, 577–78 (1972)). In other words, the substantive rights created only by state law "are not subject to substantive due process protection . . . because 'substantive due process rights are created only by the Constitution." *Id.* (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring)). State governments, therefore, may rescind rights they create, but only if they follow the dictates of procedural due process before completing the recission. *Id.*

So the question here turns on what exactly procedural due process requires in Jones's situation. Luckily, the Supreme Court has addressed this issue squarely, holding that a "tenured employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story" before a state agency can fire her. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The parties make a variety of arguments for and against the adequacy of the procedures used by Geneva County. The problem for Jones, however, is that even assuming Geneva County deprived her of due process initially, she has not shown that Alabama failed to afford her a remedy for the alleged constitutional violation after it happened.

The Eleventh Circuit has consistently held that doing so is necessary. Indeed, so long as the state provides a remedy for an initial deprivation of due process rights, the plaintiff cannot succeed on a procedural due process claim under § 1983. *See, e.g.*, *McKinney*, 20 F.3d at 1563 (upholding summary judgment in favor of municipality because Florida courts had power to remedy the due process violation); *Bell v. City of Demopolis*, 86 F.3d 191, 192 (11th Cir. 1996) ("Alabama courts . . . review employment termination proceedings both to determine whether they are supported by substantial evidence and to see that the proceedings comport with procedural due process."); *Lumpkin v. City of Lafayette*, 24 F. Supp. 2d 1259, 1265 (M.D. Ala. 1998) ("The Alabama courts were available to hear Mr. Lumpkin's claim that the city officials failed to follow established procedures requiring notice and a hearing before his termination."); *Wallace v. City of Montgomery*, 956 F. Supp. 965, 981 (M.D. Ala. 1996) (granting summary judgment because Alabama state courts can remedy procedural due process violations in municipal employment context). This rule stems from the nature of a procedural due process claim: the alleged violation does "not become complete 'unless and until the state refuses to provide due process.'" *McKinney*, 20 F.3d at 1562 (quoting *Zinermon v. Burch*, 494 U.S. 113, 123 (1990)).

Here, Jones has an appeal pending with the Circuit Court of Geneva County.[13] And she presumably can appeal any adverse decision by that court to the Alabama Court of

---

[13] Perhaps seeing the weakness in her procedural due process claim, Jones asks the Court to stay the proceedings while she seeks to vindicate her rights in state court. But procedural due process only requires that she have an avenue for redress available to her. It doesn't guarantee a smooth drive or even that she'll reach her destination.

Civil Appeals and then file a writ of certiorari to the Supreme Court of Alabama if she still remains unsatisfied with the result. The Constitution's Due Process Clause requires no more. Accordingly, the defendants' motion for summary judgment on Jones's procedural due process claims is due to be granted.

### 2.    First Amendment claims

The First Amendment prohibits government officials from firing or modifying the conditions of an employee's job based on the employee's political affiliation. *See, e.g.*, *Republican Party of Ill. v. Rutan*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). The reason for this is simple: "conditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association.'" *Rutan*, 497 U.S. at 69 (citing *Elrod*, 427 U.S. at 359). It "pressures employees to pledge political allegiance to a party with which they prefer not to associate, to work for the election of political candidates they do not support, and to contribute money to be used to further policies with which they do not agree." *Id.*

Yet the First Amendment does not give a government employee a broad right to employment, let alone the right to dictate the terms of it. Quite to the contrary, the Supreme Court has made clear that a governmental employer "has a significant interest in ensuring that it has effective and efficient employees." *Rutan*, 497 U.S. at 70. Thus it can

deploy appropriate means to those ends.[14] *Id.* ("the government can ensure employee effectiveness and efficiency . . . [by] discharging staff members whose work is inadequate." (citing *Elrod*, 427 U.S. at 365–66)).

To balance these competing concerns, the plaintiff has to make two showings to succeed on a First Amendment association claim against a government employer. She first has to show that the First Amendment protects her activity. *Mt. Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). If she can establish that it does, she must then produce sufficient evidence showing that the protected conduct amounted to a substantial or motivating factor in the decision to take adverse employment action against her. *Hatcher v. Bibb Cnty. Bd. of Public Ed. & Orphanage*, 809 F.2d 1546, 1556 (11th Cir. 1987); *Holley v. Seminole Cnty. Sch. Dist.*, 755 F.2d 1492, 1500 (11th Cir. 1985). Should the plaintiff carry her initial burden, the government employer gets the opportunity to show that it would have made the same decision "even in the absence of the protected conduct." *Hatcher*, 809 F.2d at 1556 (citing *Mt. Healthy*, 429 U.S. at 287). The threshold question—whether the First Amendment protects the plaintiff's conduct—is a question of law for the court to decide. *Id.* (citing *Holley*, 755 F.2d at 1500–01; *Sykes v. McDowell*, 786 F.2d 1098, 1103 (11th Cir. 1986)). "[T]he other elements are questions of fact," *id.*, which are usually more appropriately left to the jury to resolve, except, of course, when no genuine issue of material fact exists.

---

[14] Although not relevant here, a governmental employer can in fact discriminate based on political loyalty when "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518.

Jones hinges her First Amendment claim on her close personal relationship with Harry Adkinson, the probate judge that Hamic beat in the 2006 election (Jones Dep. 56–57); some statements Hamic allegedly made in the run up to the election to the effect that he would fire her if he won (*id.* at 64–65); and Hamic's ostensible dislike of Jones "because of [her] association with Judge Adkinson" (*id.* at 178–79). For support, she relies on *Rutan* for the proposition that the "failure to affirmatively support a candidate or party can form the basis for a First Amendment retaliation claim." (Doc. # 112 at 34–35.) And from there she argues that she has provided direct evidence of Hamic's intent to terminate her well before her run-in with Ward, and that this, combined and her close association with Adkinson, is "more than sufficient to survive a motion for summary judgment."

At first glance, the defendants seem to have the better of the argument about whether Jones engaged in protected activity. The associational rights the Supreme Court has recognized as deserving of First Amendment protection deal with an employee's membership in an expressive association like a political party, not a personal relationship with another employee or some other individual. *See Rutan*, 497 U.S. at 75 (holding governor cannot refuse to hire plaintiffs because they did not belong to Republican Party); *Elrod*, 427 U.S. at 351, 373 (holding it unconstitutional for newly elected Democratic sheriff to replace office staff with members of his own party when incumbent staffers refused to affiliate with his party); *Branti*, 445 U.S. at 514–16 (finding First Amendment barred newly appointed public defender who was a Democrat from firing assistant public defenders for not supporting the Democratic Party). The Eleventh Circuit

has gone a step further, however, finding that First Amendment associational claims need not deal with political or public matters; rather, purely private concerns are protected, too. *Hatcher v. Bibb Cnty. Bd. of Public Ed. & Orphanage*, 809 F.2d 1546, 1556 (11th Cir. 1987) (denying summary judgment where government employee brought First Amendment claim based on her bringing her minister and a school board member to her meeting with assistant superintendent); *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir. 1984) (holding public employee's choices about whom to date enjoy constitutional protection); *Hastings v. Bonner*, 578 F.2d 136 (5th Cir. 1978) (holding teacher bringing outsiders to meeting with superintendent merits constitutional protection).[15] Although other circuit courts of appeal disagree with this approach, *see Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2003) (requiring association to relate to a matter of public concern before First Amendment applies); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249–50 (4th Cir. 1999); *Martin v. City of Del City*, 179 F.3d 882, 888 (10th Cir. 1999); *Marshall v. Allen*, 984 F.2d 787 (7th Cir. 1993); *Boals v. Gray*, 775 F.2d 686 (6th Cir. 1985); *but see Boddie v. City of Columbus*, 989 F.2d 745, 747 (5th Cir. 1993) (declining to apply public concern requirement), the Supreme Court has yet to weigh in on the issue, so the Court must follow settled Eleventh Circuit precedent.

Applying the rule set forth in *Hatcher*, *Wilson*, and *Hastings* requires finding that Jones's friendship with Judge Adkinson is the type of association protected by the First Amendment. She has thus met her burden of showing that she engaged in a protected

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

activity. Still, she has the burden of producing enough evidence to allow a jury to find

that her relationship with Adkinson amounted to a substantial or motivating factor for her

firing.

The Court has grave concerns about whether Jones has produced any evidence on

this point. When asked about the basis for her First Amendment claim during her

deposition, the exchange went like this:

> Q. Do you know what your deprivation of right to political
> association in violation of the First Amendment of the United
> States is based on?
>
> A. My association with Harry Adkinson.
>
> Q. Would you please describe your association with Harry
> Adkinson?
>
> [Objection]
>
> A. I never—I never campaigned for my elected official, be it
> probate judge or commissioner. I never discussed my political
> affiliation with anyone. I tried to stay as neutral as I could. I knew
> that Judge Hamic and Ray Minshew did not like Harry Adkinson.
> And I felt like that's what—why they didn't like me is because of
> my association with Judge Adkinson.
>
> Q. What do you base that on?
>
> A. It was very obvious that Ray Minshew didn't like me. Judge
> Hamic told me that he didn't like me.
>
> Q. Did he tell you why?
>
> A. Actually, he told me that Ray hated my guts, but he didn't know
> why.

Q. Do you have any other basis for your belief that Hamic and Minshew didn't like you because of your association with Harry Adkinson?

A. Adkinson, yes. Not that I can recall right now.

(Jones Dep. 178–79.) Nothing in this exchange supports an inference that Hamic fired her because of her association with his predecessor, Harry Adkinson. At most, it shows that, before Hamic defeated Adkinson, he wanted to fire Jones because he did not like her. But this would by no means allow a juror to leap to the conclusion that Hamic fired Jones *because of* her past association with Adkinson. And even assuming one might be tempted to make that leap, the time between when Hamic began his term as probate judge (February 2007) and when he fired Jones (March 2008) fails to support a causal connection based on temporal proximity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (holding 20-month lapse between adverse action and protected activity does not suffice to establish a causal connection); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.") In fact, the extended time period between Hamic's election and Jones's firing arguably supports the defendants' contentions: if Hamic intended to clean house of Adkinson Loyalists, he likely would have done so immediately, not more than a year after he took office. Either way, the chaos caused by Sheriff Ward—namely the allegations he made about Jones and his instigation of her arrest—intervened in a way that no reasonable jury could conclude that Jones was fired because of her relationship with Adkinson rather than

her arrest. Accordingly, the defendants' motions for summary judgment on Jones's First Amendment claim are due to be granted.

## VI. CONCLUSION

The defendants arguably treated Donna Jones unfairly and undoubtedly could have handled the situation better. But "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs." *Bishop v. Wood*, 426 U.S. 341, 349–50 (1976). Stated another way, federal law does not allow a freestanding cause of action for general unfairness. With this in mind, the Court holds that Jones as failed to produce evidence creating a genuine issue of material fact about whether the defendants violated FLSA or her constitutional rights. As a result, it is hereby ORDERED as follows:

1. The Geneva County Personnel Board and Hazel Odom's combined Motion for Summary Judgment (Doc. # 99) is GRANTED.

2. The Geneva County Commission and Fred Hamic's combined Motion for Summary Judgment (Doc. # 101) is GRANTED.

3. Donna Jones's Joint Motion for Protective Order (Doc. # 108) is DENIED AS MOOT.

4. The defendants' Motion to Strike (Doc. # 114) is DENIED AS MOOT.

5. The defendants' Motion to Stay Trial and All Pending Deadlines (Doc. # 137) is DENIED AS MOOT.

Done this the 13th day of July, 2012.

s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE